**UNITED STATES of America,**
**Appellee,**

v.

**Robert S. PERSKY,**
**Defendant-Appellant.**

**No. 1094, Docket 75–1108.**

United States Court of Appeals, Second Circuit.

Argued June 2, 1975.

Decided June 18, 1975.

**284**

Robert S. Persky, pro se.

John C. Sabetta, Asst. U. S. Atty., S. D. N. Y. (Paul J. Curran, U. S. Atty., S. D. N. Y., on the brief), for appellee.

Before KAUFMAN, Chief Judge, and SMITH and MESKILL, Circuit Judges.

IRVING R. KAUFMAN, Chief Judge:

As Mark Twain once wrote, "there are two times in a man's life when he should not speculate: when he can't afford it, and when he can." The unfortunate truth of this observation led some forty years later to the passage of the Securities Exchange Act of 1934. As the facts underlying this appeal from a conviction[1] for violations of § 10(b) of that Act, 15 U.S.C. § 78j(b), and SEC Rule 10b–5, 17 C.F.R. § 240.10b–5, demonstrate, however, there are still times when investors would do well to heed Twain's advice.

Throughout the period covered by the indictment in this case Robert S. Persky was a partner, specializing in securities law, in the 30-man Manhattan law firm which served as general counsel to Microthermal Applications, Inc. ("Microthermal"), a company organized to develop certain patents held by its president and majority stockholder, Morton S. Kaplan. Persky was Microthermal's Secretary, and kept in constant touch with Kaplan regarding the company's legal affairs.

Microthermal went public in July of 1969, netting $700,000 on its offering the prospectus for which, drafted by Persky, provided that the proceeds remaining after expenses and other specific allocations would be invested in certificates of deposit, government securities, or other interest-bearing obligations. Unfortunately for all concerned, Kaplan elected what he supposed would be a more remunerative investment. He turned the proceeds over without restriction to Takara Partners, a hedge fund run by John Peter Galanis and Akiyoshi Yamada, and Takara put the monies into highly speculative securities, ultimately leading to devastating results.

The first transfer to Takara, some $240,000, was made in October of 1969. In January of the following year, Galanis told Kaplan that an additional investment of $240,000 would be necessary to assure repayment of funds which Takara had borrowed from Kaplan's brother-in-law, Melvin Solomon. Since Kaplan and Persky had each personally guaranteed to repay Solomon up to 25% of the principal if Takara defaulted, Kaplan caused

---

1. Section 32(a) of the Act, 15 U.S.C. § 78ff(a) provides:

 Any person who willfully violates any provision of this chapter, or any rule or regulation thereunder the violation of which is made unlawful or the observance of which is required under the terms of this chapter . . . shall upon conviction be fined not more than $10,000, or imprisoned not more than two years, or both . . .; but no person shall be subject to imprisonment under this section for the violation of any rule or regulation if he proves that he had no knowledge of such rule or regulation.

Microthermal to make the requested transfer.[2] This second $240,000 was also turned over without limitation, and the entire $480,000 was quickly dissipated.

Repeated demands by Kaplan and Persky for repayment resulted in the return of approximately $105,000—leaving $375,000 still unaccounted for. Hoping that legerdemain would succeed where business judgment had failed, Persky tried to make Microthermal disappear by finding a merger partner. To achieve this end, he sought Galanis's aid. It was subsequently arranged that Microthermal would transfer all of its liabilities and assets—except for the nonexistent $375,000, purportedly invested in a certificate of deposit to which we shall refer shortly—to a wholly owned subsidiary, Waltech Corp., which would be spun off to Microthermal's stockholders. Galanis's merger candidate, Meridian Capital Corp., would then gain control of Microthermal by selling its assets and liabilities for a control block of newly authorized Microthermal stock. Finally, Microthermal would change its name to Meridian Capital, and Persky and Kaplan would resign as officers.

A formal agreement was drawn up at Persky's direction and signed on August 13, 1970. The October 26, 1970 closing was conditioned upon approval of the transaction by Microthermal and Meridian stockholders. A press release, prepared at Persky's instance and issued on August 14, 1970, announced the proposed Waltech transfer and spin off, stated that Microthermal's residual assets would then approximate $375,000, and described the substance of the Microthermal-Meridian agreement. Sent to various financial media, the press release was printed in its entirety in the O.T.C. Market Chronicle on August 27, 1970.

The fly in the ointment, of course, was that the $375,000 had been squandered by Takara. After repeated unavailing demands to see the certificate of deposit which was the basis of the proposed merger, Meridian's controlling shareholder, Robert Hagopian, decided not to consummate the agreement. Persky, however, had already arranged for notice to be sent on October 9 to all Microthermal stockholders, announcing over his name a special stockholders' meeting to approve the transfer from Microthermal to Waltech of "substantially all of the operating assets, except for approximately $375,000," and to ratify the agreement with Meridian. Galanis prevailed upon Meridian not to reveal the cancellation of the acquisition; and Hagopian agreed to go along with a cover-up story concocted by Persky which blamed the merger's failure on Meridian's inability to resolve an outstanding claim against it by a company known as Colorado Corporation. At the Microthermal shareholders' meeting on October 20, 1970 the Waltech and Meridian transfers were approved. The merger's collapse apparently was never announced to the stockholders. On October 23, 1970 another press release was issued under Persky's direction to all Microthermal stockholders, reporting that "Micro has transferred substantially all of its assets, except $375,000, to Waltech Corporation. . . ."

Persky was undaunted by the series of reverses and, soon after the failure of the Meridian merger, initiated the search for another solution to Microthermal's problems. Galanis this time introduced him to Ramon D'Onofrio, who controlled U. S. Secretarial Institute, Ltd., a small and essentially worthless closely held corporation. For a "fee" of $50,000 D'Onofrio agreed to have Secretarial buy

---

2. In *United States* v. *Zane*, 495 F.2d 683, 687 n. 2. (2d Cir.), *cert. denied*, 419 U.S. 895, 95 S.Ct. 174, 42 L.Ed.2d 139 (1974), the court stated that "Kaplan and Persky had together invested some $200,000 of their personal fortune in Takara Partners in a 90-day 'put.' . . . Galanis prevailed upon Kaplan to transfer another $240,000 of Microthermal's funds to Takara Partners [in January of 1970] to be used to repay Kaplan's and Persky's personal investment." In the present case, there was no evidence that Persky's personal funds were directly transferred to Takara.

the non-existent $375,000 certificate of deposit in return for 49% of the stock of his company. A formal agreement, drafted under Persky's supervision, was consummated on November 20, 1970 in Persky's office, where Secretarial's representative received an empty envelope purportedly containing a $375,000 bearer certificate of deposit. But this did not signal the termination of these complex and convoluted transactions.

' In an attempt to relieve themselves of any continuing affiliation with Microthermal, Persky and Kaplan finally caused the corporation to be merged into Continental Engineering and Development, Inc., a closely held Washington corporation which had been· seeking to acquire a public shell. In March of 1971 Persky supervised the drafting of the necessary documents and had them backdated to November 20, 1970.

The merger with Continental Engineering was not, however, the end of Persky's troubles. On March 1, 1973 he was indicted for filing a false Form 10K Annual Report with the Securities and Exchange Commission (SEC); for failing· to file a current Form 8K for November of 1970; and for violations of § 10(b)[3] and Rule 10b–5.[4] The 10b–5 prosecution which sought to punish Persky for the false press releases and statements resulted in the conviction from which this appeal is taken.[5] Persky was sentenced to two years' imprisonment,[6] and two years' probation. He has already served his prison term.

■ Persky's primary contention on appeal is that § 10(b) and Rule 10b–5 are

---

**3.** It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

**4.** It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
 (a) To employ any device, scheme, or artifice to defraud,
 (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
 (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
in connection with the purchase or sale of any security.

**5.** The March 1, 1973 indictment charged Persky and others with committing various crimes specified in four of the indictment's twelve counts. Two counts—dealing with the

Form 8K, § 10(b), and Rule 10b–5 violations—were severed at the instance of two defendants not named in those counts. Trial on the other charges resulted in Persky's conviction, on June 13, 1973, for filing a false Form 10K. We affirmed. *Zane, supra* note 2. Trial on the remaining two counts began on January 13, 1975.

Persky's fraudulent conduct was established at trial primarily by Galanis and Martin Gibbs, an associate in Persky's law firm during the times in question. The two men, along with others, testified concerning Persky's roles in regard to the August 14 press release relating to the Waltech transfer and spin off (and the Meridian merger), the October 9 notice to shareholders, the October 20 stockholders' meeting, and the October 23 release regarding the Waltech transfer. All of these had indicated that Microthermal still possessed the $375,000, although the money had long since been dissipated by Takara.

The Government also introduced evidence that Microthermal stock was traded publicly during the periods involved. ⸗ In addition, Lloyd Albin, one of those present at the October 20 stockholders' meeting, testified that he bought 1,000 shares of Microthermal stock over the counter on November 30, 1970, and would not have done so had he known the true state of Microthermal's finances. Judgment of acquittal was entered on the Form 8K count at the close of the Government's case.

**6.** Three months were to be served concurrently with a four-month term imposed as a result of the 10K conviction; the remainder of the two-year sentence was suspended.

unconstitutionally vague. The focus of this claim has been that a defendant is given insufficient warning of the sorts of fraud contemplated by the statute. The law on vagueness has been well enunciated over the years. Prosecution under a criminal statute deprives a defendant of due process if the statute's meaning is so uncertain or indefinite that it

"fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute," United States v. Harriss, 347 U.S. 612, 617, 74 S.Ct. 808, 812, 98 L.Ed. 989, [or] encourages arbitrary and erratic arrests and convictions. Thornhill v. Alabama, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093; Herndon v. Lowry, 301 U.S. 242, 57 S.Ct. 732, 81 L.Ed. 1066.

Papachristou v. City of Jacksonville, 405 U.S. 156, 162, 92 S.Ct. 839, 843, 31 L.Ed.2d 110 (1972). The application of this test to § 10(b) and Rule 10b–5 presents several novel issues. Perhaps the most interesting is the apparent dissonance between the general rule that criminal statutes are to be strictly construed in favor of the accused, United States v. Enmons, 410 U.S. 396, 411, 93 S.Ct. 1007, 35 L.Ed.2d 379 (1973), and the realization that the civil incarnations of the anti-fraud provisions have, as remedial legislation, been openly and avowedly construed broadly, SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 861 (2d Cir. 1968), cert. denied, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969); Heit v. Weitzen, 402 F.2d 909, 913 (2d Cir. 1968), cert. denied, 395 U.S. 903, 89 S.Ct. 1740, 23 L.Ed.2d 217 (1969). Cf. Tcherepnin v. Knight, 389 U.S. 332, 336, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967).

 Persky contends that the expansive civil interpretations of Rule 10b–5 have so stretched the Rule that he was not provided fair warning that his conduct was fraudulent by the standard of strict construction due criminal statutes. But, a similar argument has been adequately disposed of in the context of a criminal prosecution for violation of § 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a), whose language regarding fraudulent conduct is almost identical to, and indeed was the model for, Hooper v. Mountain States Securities Corp., 282 F.2d 195, 201 n. 4 (5th Cir. 1960), cert. denied, 365 U.S. 814, 81 S.Ct. 695, 5 L.Ed.2d 693 (1961), Section 10(b) and Rule 10b–5:

While it is true that the language of [the section] uses general terms, its provisions, while perhaps falling short of the standards of immutability followed by the laws of the Medes and the Persians, are definite enough according to the canons of Anglo-American law.

Subjecting the words . . . to critical scrutiny, we find no fatal ambiguity or indefiniteness, such as might prove a pitfall to any person, in the language of the appellants, "attempting to obey the law." No honest and reasonable citizen could have difficulty in understanding the meaning of "untrue," "material fact," "any omission to state a material fact," "in light of the circumstances under which they were made," or "misleading." All these terms, it is true, call for interpretation in accordance to the facts of a given case. So do the terms "malice," "probable cause," "self-defense," "negligence," "fraud," "duress," "justification," and thousands of other expressions well established in the law.

Coplin v. United States, 88 F.2d 652, 657 (9th Cir.), cert. denied, 301 U.S. 703, 57 S.Ct. 929, 81 L.Ed. 1357 (1937).[7] More-

7. The Coplin court dealt with the portions of § 17(a) which then read:

It shall be unlawful for any person in the sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—

(1) to employ any device, scheme, or artifice to defraud, or

(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made,

over, if anything is clear from the Section and Rule, it is that conduct fraudulent even under the most restrictive definition of common law fraud, as Persky's surely was, is proscribed under § 10(b). *See* III Loss, *Securities Regulation* at 1431, 1435 (1961 ed.).[8] Nor is it appropriate for Persky to challenge the vagueness of § 10(b) and the Rule on behalf of those whose conduct would be more ambiguous but who are not before us. *Parker* v. *Levy,* 417 U.S. 733, 756, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974). *Cf. Dombrowski* v. *Pfister,* 380 U.S. 479, 486–87, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965).

■ The second contention raised by Persky is that the district judge erred in his instruction regarding the proof necessary under the "in connection with" requirement of the Section and Rule. The charge given by the trial court stated, in relevant part:

> [T]he Government need not show that the defendant, Mr. Persky, or any of the others named, bought or sold themselves shares of Micro or participated in such transactions. It is sufficient if the Government shows that from the period between July 1, 1970, and March 31, 1971, there were purchases or sales or both of shares of Micro, and that the device or scheme employed or act or practice was of a sort that would cause reasonable investors to rely thereon, and in connection therewith so relied to purchase or sell shares of Micro.

This instruction closely follows our holding in *Texas Gulf Sulphur, supra,* 401 F.2d at 860 and *Heit* v. *Weitzen, supra,* 402 F.2d at 913.[9]

■ Nor do we see any reason to employ a stricter construction in this criminal action.[10] *See United States* v. *Peltz,* 433 F.2d 48, 53 (2d Cir. 1970), *cert. denied,* 401 U.S. 955, 91 S.Ct. 974, 28 L.Ed.2d 238 (1971); *United States* v. *Clark,* 359 F.Supp. 128, 130 (S.D.N.Y. 1973). The crucial point is that a clear and definite statement of the conduct proscribed antedated Persky's conduct. *Bouie* v. *City of Columbia,* 378 U.S. 347, 362, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964) (dictum); *Parker* v. *Levy, supra,* 417 U.S. at 754, 94 S.Ct. 2547.

Affirmed.

---

in the light of the circumstances under which they were made, not misleading. 88 F.2d at 655–56. Section 10(b) and Rule 10b–5 proscribe the same types of conduct, but contain words covering fraud perpetrated on sellers as well as purchasers. Section 17(a) did not contain any "in connection with" language. We shall deal with that language from § 10(b) and Rule 10b–5 separately.

8. As an attorney familiar with securities law, Persky could hardly hope to claim not to be a "person of ordinary intelligence," *Papachristou, supra,* however that term might be defined for violations of § 10(b) and Rule 10b–5. Indeed, Persky did not even attempt to prove that he lacked knowledge of the provisions of Rule 10b–5, to avoid imprisonment under the provisions of § 32(a), *supra* note 1.

9. Those cases construed the phrase "in connection with" in determining who may be a defendant. Persky's reliance on *Blue Chip Stamps* v. *Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975)—interpreting the words "purchase or sale" in the context of a private damage action—is inapposite. *Blue Chip Stamps* dealt not with whether there was a violation of Rule 10b–5, but decided instead who had standing as a proper plaintiff for purposes of enforcement. Indeed, *Blue Chip Stamps* did no more than adopt the rule of *Birnbaum* v. *Newport Steel Corp.,* 193 F.2d 461 (2d Cir.), *cert. denied,* 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952), which has peacefully coexisted in this Circuit and elsewhere with *Texas Gulf Sulphur* and *Heit* v. *Weitzen.*

10. There is no merit to Persky's contention that the evidence failed to establish that Microthermal shares were purchased or sold in reliance upon his fraudulent conduct. In addition to the ample evidence of trading on the open market during the time in question, the Government showed that Lloyd Albin had purchased 1,000 shares on November 30, 1970 in reliance on the corporation's public statements and representations made at the October 20 shareholders' meeting.