[No. 5349-1-III.   Division Three.   March 12, 1985.]

THE STATE OF WASHINGTON, *Respondent*, v. LAWRENCE DAVID MARKHAM, *Appellant*.

*Phelps R. Gose* and *Axtell, Karademos, Briggs & Gose,* for appellant (appointed counsel for appeal).

*Donald C. Brockett, Prosecuting Attorney,* and *Fred J. Caruso, Chief Deputy,* for respondent.

MUNSON, J.—Lawrence D. Markham appeals his convictions of conspiracy to commit securities fraud, conspiracy to commit first degree theft, fraud in connection with the offer and sale of a security (nine counts), first degree theft (nine counts), and sale of unregistered securities. He contends: (1) RCW 21.20.010 is void for vagueness; (2) a certain attorney opinion letter should have been admitted into evidence; (3) the jury should have been instructed intent to permanently deprive is an element of any form of first degree theft; (4) the jury should have received the WPIC instruction on criminal intent; (5) the court should have given Markham's proposed instruction to the effect mismanagement is not a crime when one is merely "visionary in his plans"; (6) the accomplice instruction should not have been given; (7) a principal–agent liability instruction should not have been given; (8) hearsay was improperly injected into the case; and (9) there was prosecutorial misconduct in the form of leading questions, constantly forcing Markham to object, and eliciting testimony about crimes not charged. We affirm.

Between April 1979 and February 1980, Markham held varying interests in four corporations. Money Vendors Corporation began as a sole proprietorship of Markham and was incorporated in November 1978. The purpose of Money Vendors was to supply vending and other machines to Lease Funding, Ltd., at a 100 to 400 percent markup. Money Vendors was to obtain locations for the machines and lessees to run them. Markham and Money Vendors assured the lessees they could have their lease deposits

returned and leases canceled if not satisfied. Lessees were also told they need not make any payments until all machines covered by a lease were in place.

Lease Funding, Ltd., began as a partnership between Harold Kunz and Markham. It was incorporated in November 1979, with Markham owning 49 percent and Kunz 51 percent. The purpose of Lease Funding was to find investors to purchase vending and other machines from Money Vendors. The investors paid a 10 percent fee to Lease Funding in addition to the purchase price of their machines. The purchasers would then act as lessors of the machines. Lease Funding advertised a 20 percent return on its leases, and provided computer printouts showing projected profits and tax deductions. Lease Funding was to collect payments from the lessees, deduct sales tax, and remit the balance to the lessors. Markham and Money Vendors provided personal and corporate guaranties of the lease payments. The purchaser–lessors did not meet the lessees; the leases and documents acknowledging receipt of the machines were signed by the lessees before presentation to the purchaser–lessors. Markham attended at least one "seminar" for prospective buyers and approved a Lease Funding sales presentation.

Each Lease Funding transaction involved six documents: (1) bill of sale signed by Markham as president of Money Vendors; (2) UCC–1 form; (3) delivery and acceptance receipt signed by a lessee; (4) lease agreement signed by a lessee and then a lessor; (5) personal and corporate guaranties and hold harmless agreement, signed by Markham as president of Money Vendors; and (6) certificate of insurance.

Kunz requested a "no action" letter from the securities division of the Washington Department of Licensing. The securities division declined to issue such a letter. Markham was a formerly licensed securities salesman and wished to comply with securities laws. Markham consulted an attorney, who apparently told him the transaction was not a security.

Markham Corporation was incorporated in June 1979. Markham owned 75 percent and Kunz 25 percent. Its purpose was to manage Money Vendors and Lease Funding.

COMSY, Inc., was a computer company which was incorporated in December 1979. Some employees provided printouts of the potential income and tax advantages to Lease Funding investors. Markham purchased the local Olivetti franchise and was preparing to go into the computer leasing business when the four corporations went into receivership.

The leasing enterprise collapsed, primarily because Markham and alleged coconspirators Kunz and Phillip Stephan diverted Lease Funding moneys to their personal use and to run Markham Corporation rather than purchase machines. Furthermore, lessors received payments even though their machines were not yet in place and the lessees had not commenced making payments. Funds invested for machines were thus used for salaries, day–to–day expenses (including payments for airplanes and boats, a Mercedes and other automobiles, a motor home, and clothing), and for lease payments to previous investors. Markham and Kunz had been repeatedly warned not to "bleed" the companies with high salaries and not to pay operating expenses out of the money invested to buy machines. They were also frequently told various business accounts were overdrawn. At one point, Markham laughed and said it would be easier to get more money than to cut down on expenses.

Kunz and Stephan[1] each pleaded guilty to one count of securities fraud. Markham was convicted by a jury of one count of conspiracy to commit fraud in connection with the offer and sale of a security, one count of conspiracy to commit first degree theft, nine counts of securities fraud, nine counts of first degree theft, and one count of sale of unregistered securities. Markham appeals.

---

[1] *State v. Stephan*, 35 Wn. App. 889, 671 P.2d 780 (1983).

Markham first contends RCW 21.20.010[2] is void for vagueness because he could not know he was violating the securities law until the jury returned its verdict. He appears to argue in the alternative both facial invalidity and invalidity as applied. He bases his contention on the fourteenth amendment to the United States Constitution and on article 1, section 3 of the Washington Constitution.[3] He does not argue a different analysis under the state constitution; therefore, the analysis will be based on federal due process principles. *State v. Richmond,* 102 Wn.2d 242, 243 n.1, 683 P.2d 1093 (1984).

To withstand a vagueness challenge, a statute must have two components: (1) it must give adequate notice of prohibited conduct so that a person of ordinary intelligence would not have to guess at its meaning, and (2) it must have adequate standards to prevent arbitrary enforcement. *State v. Maciolek,* 101 Wn.2d 259, 264–65, 676 P.2d 996 (1984). A statute is presumed constitutional and the party challenging it has the burden of proving it unconstitutional beyond a reasonable doubt. *State v. Maciolek, supra* at 263.

If the statute is alleged to be invalid on its face,

---

[2]RCW 21.20.010 provides:

"It is unlawful for any person, in connection with the offer, sale or purchase of any security, directly or indirectly:

"(1) To employ any device, scheme, or artifice to defraud;

"(2) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or

"(3) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person."

RCW 21.20.005(12) provides:

"(12) 'Security' means any . . . investment contract; investment of money or other consideration in the risk capital of a venture with the expectation of some valuable benefit to the investor where the investor does not receive the right to exercise practical and actual control over the managerial decisions of the venture; . . . or, in general, any interest or instrument commonly known as a 'security', . . ."

[3]"No person shall be deprived of life, liberty, or property, without due process of law."

then the court looks only to the statute; the defendant's conduct is irrelevant. If, however, the defendant alleges the statute is only unconstitutional in part, or the court finds the statute is not vague on its face, but potentially vague, then defendant's conduct must be examined to see if it lies within the constitutional "core" of the statute. *State v. Maciolek, supra* at 262–63. A sufficiently specific prior judicial construction can save a statute from unconstitutional vagueness. *State v. Richmond, supra* at 245.

The 1933[4] and 1934[5] federal securities acts have both withstood vagueness challenges. *United States v. Persky,* 520 F.2d 283 (2d Cir. 1975); *Speed v. Transamerica Corp.,* 99 F. Supp. 808 (D. Del. 1951). The federal statutes employ much of the same language found in RCW 21.20.

> While it is true that the language of [the section] uses general terms, its provisions, while perhaps falling short of the standards of immutability followed by the laws of the Medes and the Persians, are definite enough according to the canons of Anglo–American law.

---

[4]Section 17(a) of the Domestic Securities Act of 1933 provides:

"It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—

"(1) to employ any device, scheme, or artifice to defraud, or

"(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

"(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser." 15 U.S.C. § 77q(a).

[5]Section 10(b) of the Securities Exchange Act of 1934 provides:

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

". . .

"(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j.

Subjecting the words . . . to critical scrutiny, we find no fatal ambiguity or indefiniteness, such as might prove a pitfall to any person, in the language of the appellants, "attempting to obey the law." No honest and reasonable citizen could have difficulty in understanding the meaning of "untrue," "material fact," "any omission to state a material fact," "in light of the circumstances under which they were made," or "misleading." All these terms, it is true, call for interpretation in accordance to the facts of a given case. So do the terms "malice," "probable cause," "self–defense," "negligence," "fraud," "duress," "justification," and thousands of other expressions well established in the law.

*United States v. Persky, supra* at 287 (quoting *Coplin v. United States,* 88 F.2d 652, 657 (9th Cir.), *cert. denied,* 301 U.S. 703, 81 L. Ed. 1357, 57 S. Ct. 929 (1937)).

Markham was charged with offering or selling a security in the form of an investment contract. While an "investment contract" is not defined in the statute, it has long been the subject of judicial construction. The seminal case is *SEC v. W.J. Howey Co.,* 328 U.S. 293, 90 L. Ed. 1244, 66 S. Ct. 1100, 163 A.L.R. 1043 (1946), which defined an investment contract as follows:

[A]n investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party, it being immaterial whether the shares in the enterprise are evidenced by formal certificates or by nominal interests in the physical assets employed in the enterprise.

*SEC v. W.J. Howey Co., supra* at 298–99. The court noted the term "investment contract" appeared in many state securities statutes which predated the federal law.

The transactions at issue in *Howey* were sales of portions of Florida citrus groves by W. J. Howey Company, coupled with service contracts under which Howey–in–the–Hills Service, Inc., would develop, market and harvest the crops.

Thus all the elements of a profit–seeking business venture are present here. The investors provide the capital and share in the earnings and profits; the promoters manage, control and operate the enterprise. It follows that the arrangements whereby the investors' interests are made manifest involve investment contracts, regardless of the legal terminology in which such contracts are clothed. The investment contracts in this instance take the form of land sales contracts, warranty deeds and service contracts which respondents offer to prospective investors.

*SEC v. W.J. Howey Co., supra* at 300.

In interpreting RCW 21.20, the Washington Supreme Court has followed the *Howey* test as construed by *SEC v. Glenn W. Turner Enters., Inc.,* 474 F.2d 476 (9th Cir.), *cert. denied,* 414 U.S. 821, 38 L. Ed. 2d 53, 94 S. Ct. 117 (1973) (requirement that profits come "solely" from efforts of others means undeniably significant, essential managerial efforts).[6] *Sauve v. K.C., Inc.,* 91 Wn.2d 698, 591 P.2d 1207 (1979); *McClellan v. Sundholm,* 89 Wn.2d 527, 574 P.2d 371 (1978). *Sauve* involved financing of an appliance leasing scheme. *McClellan* involved the sale of unidentified silver bullion, coupled with selection, storage and resale services. Both were found to involve investment contracts.

RCW 21.20.010 is not vague. Assuming arguendo it is potentially vague, Markham's conduct clearly fell within the "hard core" of the statute, as defined by many years of judicial construction. *State v. Richmond, supra* at 245. As in *Howey,* the promoters here controlled and operated the enterprise. These transactions involved a bill of sale, lease and service agreement similar to those in *Howey. See also*

---

[6]"Risk capital" was added to the definition of a security by Laws of 1979, 1st Ex. Sess., ch. 68, § 1(12), p. 1197, effective September 1, 1979, during the time of Markham's misconduct. Scholars differ over whether risk capital is a separate security or merely a more liberal definition of "investment contract" than that found in *Howey.* Stevenson & O'Leary, *Definition of a Security: Risk Capital and Investment Contracts in Washington,* 3 U. Puget Sound L. Rev. 83 (1979). Markham was charged and convicted under the more stringent investment contract definition, and we therefore need not consider the impact of the amendment on the instant transactions.

*Wheeler v. State,* 659 P.2d 1241 (Alaska Ct. App. 1983) (vending machine sales); *Rose v. Dobras,* 128 Ariz. 209, 624 P.2d 887 (Ct. App. 1981) (orchard leases coupled with management agreements); *People v. Skelton,* 109 Cal. App. 3d 691, 167 Cal. Rptr. 636 (1980), *cert. denied,* 450 U.S. 917 (1981) (cow leasing scheme).

■ Without assigning error to the sufficiency of the evidence, Markham argues the State did not prove he knew he was selling a security or present expert testimony the transaction involved was in fact a security. We need not consider the matter, RAP 10.3, but nevertheless note knowledge of the securities laws is not an element of a criminal prosecution for their violation.[7] *United States v. Brown,* 578 F.2d 1280 (9th Cir.), *cert. denied,* 439 U.S. 928, 58 L. Ed. 2d 322, 99 S. Ct. 315 (1978); *State v. Cox,* 17 Wn. App. 896, 566 P.2d 935 (1977), *review denied,* 89 Wn.2d 1013, *cert. denied,* 439 U.S. 823, 58 L. Ed. 2d 115, 99 S. Ct. 90 (1978). The requirement of willful violation is satisfied if specific intent is shown regarding fraudulent, misleading or deceitful conduct. *United States v. Brown, supra.* The jury heard exhaustive testimony on the nature of the lease transactions. The jury was instructed on the *Howey* test, from which it could determine the leasing scheme was an investment contract within the securities law.

Markham next contends a letter to him from an attorney should have been admitted into evidence. The letter purportedly sets forth the opinion the transactions at issue do not involve securities. (The proposed exhibit is not part of the record on appeal.) The trial court ruled the letter would not be admissible because the attorney was available to testify. There was no showing he was not available. Markham argued the letter should be admitted, and then the

---

[7]RCW 21.20.400 provides:

"Any person who wilfully violates any provision of this chapter except RCW 21.20.350, or who wilfully violates any rule or order under this chapter, or who wilfully violates RCW 21.20.350 knowing the statement made to be false or misleading in any material respect, shall upon conviction be fined not more than five thousand dollars or imprisoned not more than ten years, or both; . . ."

prosecution could call the attorney to testify if it wished to establish the basis for his opinion.

Markham contends the letter was a business record, and as such, was admissible under RCW 5.45.020. He concedes admission of hearsay business records is a matter of trial court discretion. *State v. Dorman,* 30 Wn. App. 351, 633 P.2d 1340 (1981). However, he argues the court abused its discretion because the letter was relevant to Markham's good faith and to the issue of whether the leasing venture involved securities. As stated above, Markham need not have known he was violating securities laws in order to be found guilty thereof. The trial court did not abuse its discretion.

Markham argues that without the letter his counsel could not effectively assist him. U.S. Const. amend. 6; Const. art. 1, § 22 (amend. 10). Again, he makes no arguments the two constitutions should be treated differently, so analysis will be under federal law. *State v. Richmond, supra.* The test is whether, after considering the entire record, it can be said defendant received effective representation and a fair and impartial trial. *State v. Renfro,* 96 Wn.2d 902, 639 P.2d 737, *cert. denied,* 459 U.S. 842, 74 L. Ed. 2d 86, 103 S. Ct. 94 (1982). Markham testified he hired an attorney for securities advice because Markham wanted to comply with government agencies. He also testified he received a letter from the attorney regarding the securities problem. The record as a whole reveals that, on several occasions, Markham was able to convey to the jury his attorney's opinion these transactions were not securities. It is apparent that, while denied review of the letter itself, the jury was well advised of its contents. We find no error.

Markham next contends the court erred in failing to instruct the jury that intent to permanently deprive is an element of every form of theft. Markham was charged under RCW 9A.56.020(1)(a) and (b):

(1) "Theft" means:
(a) To wrongfully obtain or exert unauthorized control over the property or services of another or the value

thereof, *with intent to deprive* him of such property or services; or

(b) By color or aid of deception to obtain control over the property or services of another or the value thereof, with *intent to deprive* him of such property or services;
. . .

(Italics ours.) The jury was instructed it must find intent to permanently deprive under (1)(b) but not under (1)(a).

■ RCW 9A.56.020(1)(a) covers both embezzlement and theft by taking. Intent to permanently deprive is not an element of embezzlement. *State v. Vargas,* 37 Wn. App. 780, 683 P.2d 234 (1984); *State v. Dorman, supra.* Theft by taking is the statutory equivalent of common law larceny and does include the element of intent to permanently deprive. *State v. Burnham,* 19 Wn. App. 442, 576 P.2d 917, *review denied,* 90 Wn.2d 1020 (1978).

The jury was instructed "wrongfully obtained or exerted unauthorized control over the property of another" means "the intent to convert the property of another to one's own use or someone other than the owner or person entitled thereto". As in *State v. Vargas, supra,* while the jury was thus instructed on both theft by taking and embezzlement, the facts do not support a conviction for theft by taking. Theft by taking involves a trespass, whereas in embezzlement, the property comes lawfully into possession of the taker. *State v. Vargas, supra* at 785. The jury was therefore properly instructed.

Markham next contends the court should have given WPIC 10.01: "A person acts with intent or intentionally when acting with the objective or purpose to accomplish a result which constitutes a crime."

■ The number of instructions given is a matter of trial court discretion. *State v. Russell,* 33 Wn. App. 579, 657 P.2d 338 (1983), *rev'd in part on other grounds,* 101 Wn.2d 349, 678 P.2d 332 (1984). The court need not give a requested instruction if the subject matter is adequately covered in other instructions. *State v. Etheridge,* 74 Wn.2d 102, 443 P.2d 536 (1968). Here, the jury was instructed one

element of conspiracy is intent to perform conduct constituting a crime. The jury was also instructed any securities violation must have been willful, and, as discussed above, was instructed on intent to deprive for the theft counts. No exception was taken to instruction 16, which defines the mental states of knowledge and willfulness. The court did not abuse its discretion.

Markham next contends the court should have given his proposed instruction 31:

A man may be visionary in his plans and believe they will succeed, and yet, in spite of their ultimate failure, be incapable of committing conscious fraud. Human credulity may include among its victims even the supposed imposter.

Under our system of laws individuals are not punished criminally for mere mistakes, mere mismanagement, mere carelessness, or mere errors of judgment. They are punished only for intentional wrongdoing. The defendants here are not on trial for errors of judgment or mistakes or mismanagement, but are on trial for a criminal offense, and an essential element of that offense is an evil or criminal intent, which it is incumbent upon the government to prove to your satisfaction and beyond a reasonable doubt before you will be warranted in returning a verdict of guilty.

Markham contends he could not argue his theories without this instruction. Closing arguments were not transcribed. However, the trial court told Markham he could present the matter in closing argument, but the proposed instruction was a comment on the evidence and a negative instruction.

A party is not entitled to place his argument in the court's instructions. *State v. Birdwell*, 6 Wn. App. 284, 492 P.2d 249, *review denied*, 80 Wn.2d 1009, *cert. denied*, 409 U.S. 973, 34 L. Ed. 2d 237, 93 S. Ct. 346 (1972); *State v. Lane*, 4 Wn. App. 745, 484 P.2d 432 (1971). A proposed instruction that unwitting possession of marijuana is not unlawful was rejected in *State v. Birdwell, supra*. Proposed instructions that a witness could be honestly mistaken and that identification is a mere expression of opinion were

rejected in *State v. Lane, supra*. We find no error.

Markham next contends the court erred in giving an accomplice instruction, because it made the jury believe there was an additional conspiracy. He cites no authority for this argument.

Conspiracy requires an agreement, while accomplice liability does not. *Iannelli v. United States*, 420 U.S. 770, 777 n.10, 43 L. Ed. 2d 616, 95 S. Ct. 1284 (1975). An accomplice instruction is proper if the evidence indicates the defendant participated in the crime, even though he has only been charged as a principal. *State v. Young*, 89 Wn.2d 613, 574 P.2d 1171, *cert. denied*, 439 U.S. 870, 58 L. Ed. 2d 182, 99 S. Ct. 200 (1978). We find no error.

Markham next contends the court erred in giving instruction 21:

> Whatever a person is legally capable of doing himself can be done through another as agent. If the acts of an employee or other agent are willfully ordered or directed, or willfully authorized or consented to by the defendant, the law holds the defendant responsible for such acts as though he personally committed them.

He argues the instruction implies he could be guilty of constructive fraud, citing *Windsor v. United States*, 384 F.2d 535 (9th Cir. 1967).

In *Windsor v. United States, supra,* defendant's mail fraud conviction was reversed because there was no proof of his participation in the fraudulent aspects of a land sales scheme. Defendant was a Portland, Oregon, attorney who was working for a corporation operating in Coeur d'Alene, Idaho. The court held defendant's conviction could not rest on constructive knowledge of facts known only to others involved in the scheme. Here, however, former salesmen and staff testified Markham approved the Lease Funding sales presentation, and investors testified they had met with Markham or his signature appeared on some of the documents they received. There is more evidence of a principal–agent relationship here than in *Windsor*.

A principal is liable for unlawful acts which he

causes to be done through an agent. *State v. Peck*, 146 Wash. 101, 261 P. 779 (1927); *State v. Warburton*, 97 Wash. 242, 166 P. 615 (1917). It is true the agency instruction partially repeats the accomplice instruction,[8] but the number and contents of instructions are a matter of trial court discretion. *State v. Russell, supra.* We find no error.

Markham next contends what Kunz's salesmen told prospective investors was hearsay and should not have been admitted against Markham. Markham argues if RCW 21.20.010 is unconstitutional, then all the hearsay admitted to prove conspiracy to commit securities fraud was inadmissible and so prejudiced the jury there must be a new trial on the other counts. RCW 21.20 is not unconstitutionally vague, therefore this argument fails.

Markham argues in the alternative many of the hearsay statements were not made in the course of or in furtherance of the conspiracy. ER 801(d)(2)(v). Appellant's brief cites to the report of proceedings, but states the list is nonexclusive. Only those specific cites to the record will be considered, since it is comprised of approximately 2,500 pages of verbatim report of proceedings and over 1,000 pages of clerk's papers. RAP 10.3(a)(5).

Markham cites over 30 examples of alleged hearsay. All this testimony was admissible because it was not hearsay; it was either admissions, statements of coconspirators in the course of the conspiracy, or background information not offered for the truth of the matter asserted. We note Markham failed to make timely and specific objections to much of the testimony. ER 103(a)(1). Even if some statements were erroneously admitted, their admission did not materially affect the outcome of the trial. *State v. Tharp*, 96 Wn.2d 591, 637 P.2d 961 (1981).

Markham last contends he was entitled to a mistrial on

---

[8] "A person is legally accountable for the conduct of another person when:

"Acting with the kind of culpability that is sufficient for the commission of the crime, he causes an innocent or irresponsible person to engage in such conduct . . ."

the ground of prosecutorial misconduct. The alleged misconduct consisted of: (1) bringing out other crimes not charged; (2) asking leading questions; (3) arguing with the witnesses; (4) questioning the contents of a court order; (5) denying giving a witness immunity; and (6) forcing defense to make continuous objections.

Assuming arguendo the examples cited by Markham constitute prosecutorial misconduct, reversal is only appropriate if there is a substantial likelihood the misconduct affected the jury. *State v. Wheeler,* 95 Wn.2d 799, 631 P.2d 376 (1981); *State v. Young,* 87 Wn.2d 129, 550 P.2d 1 (1976). It is difficult to see how the prosecutor's conduct affected the jury. The alleged testimony of crimes not charged was admissible to present an entire account to the jury. *State v. Tharp, supra.* Investors who were not listed as victims testified to provide background. Whenever the prosecutor asked repetitive questions, he was admonished before the jury not to argue with the witnesses. The prosecutor was also frequently admonished against asking leading questions, which if anything would make the prosecution, not the defense, look bad in the eyes of the jury. Whether a certain witness received immunity was not relevant to any of the ultimate issues in the case and constituted only a few minutes of testimony out of a 2½–week trial. After a bench conference, the court orally instructed the jury the witness had received immunity. We find no error.

The judgment is affirmed.

GREEN, C.J., and MCINTURFF, J., concur.

Reconsideration denied April 15, 1985.

Review denied by Supreme Court June 21, 1985.