[No. 14763-3-I.  Division One.  September 8, 1986.]

THE STATE OF WASHINGTON, *Respondent,* v.
ROBERTA PHILIPS, *Appellant.*

THE STATE OF WASHINGTON, *Respondent,* v.
GORDON THOMPSON, *Appellant.*

THE STATE OF WASHINGTON, *Respondent,* v.
EUGENE R. MONTGOMERY, *Appellant.*

THE STATE OF WASHINGTON, *Respondent,* v.
WILLIAM S. SMITH, *Appellant.*

322

*Elizabeth K. Selleck, Browne, Ressler & Foster, William H. Fligeltaub, Eugene Donion,* and *Mosler, Donion, Schermer & Wallstrom,* for appellants.

*Norm Maleng, Prosecuting Attorney,* and *Greg Montgomery, Deputy,* for respondent.

RINGOLD, A.C.J.—Four codefendants, Eugene Montgomery, Gordon Thompson, Roberta Philips and William Smith, appeal the judgments and sentences imposed after a jury found them guilty of violation of The Securities Act of Washington, RCW 21.20. We have considered the numerous issues presented by the defendants and find no error.

In August 1981, Eugene Montgomery and Gordon Thompson formed Sea–Tac Mortgage, Inc. Their intent was to broker institutional and private loans. Thompson and Montgomery were both officers in Sea–Tac, but they were also involved in arranging some loan transactions. Montgomery was additionally responsible for advertising and

promotion of Sea–Tac.

William Smith began working at Sea–Tac in September 1981. Though his responsibilities initially were solely concerned with potential borrowers, in November 1981 he began dealing with investors.

Roberta Philips was hired approximately 3 weeks after Smith. She was responsible for handling the paper work necessary for the loan transactions. Philips was also a licensed real estate agent and escrow officer, and Sea–Tac relied upon her to explain the loan documents to the borrowers.

Through these officers and agents, Sea–Tac provided a service which essentially consisted of matching a borrower who had made application to Sea–Tac for a loan with an investor who wished to make an investment through Sea–Tac by funding one of these applications. Some of the borrowers who approached Sea–Tac for loans were desperately in need of money for various reasons, but had been turned down by other lenders as high credit risks. The lenders were attracted by a 30 percent annual interest rate that Sea–Tac indicated was nonusurious because the loans were for business.[1] The borrowers were required to sign a document attesting to a business purpose. Sea–Tac obtained remuneration for its services by means of a loan fee taken out of the loan proceeds before issuing a check to the borrower.

On February 19, 1982, Sea–Tac was ordered to cease operation by the Washington State Securities Division. A 16–count information was filed charging Thompson, Montgomery, Philips and Smith with various counts of securities fraud and theft in the first degree.

After a jury trial, the defendants were all convicted

---

[1]RCW 19.52.080 provides in part: "persons may not plead the defense of usury nor maintain any action thereon or therefor if the transaction was primarily for agricultural, commercial, investment, or business purposes: *Provided, however,* That this section shall not apply to a consumer transaction of any amount.

"Consumer transactions, as used in this section, shall mean transactions primarily for personal, family, or household purposes."

of various counts of securities fraud in violation of RCW 21.20.010.

## ELEMENTS OF A SECURITY

The defendants first argue that the jury was not properly instructed as to the factors requisite to finding the existence of a "security" within the scope of RCW 21.20. Contrary to defendants' assertions, the trial court did not rule as a matter of law that the instruments involved in this case were securities. Instead, the trial court submitted the issue to the jury for its determination. This decision was within the court's discretion and was well advised. *See United States v. Austin,* 462 F.2d 724, 736–37 (10th Cir.) (trial court was admonished for determining the existence of a security as a matter of law rather than submitting the question for the jury's determination), *cert. denied,* 409 U.S. 1048 (1972). Accordingly, the first question before this court is whether the instruction was proper.

Instruction 32A states:

> Security means any note as further defined in this instruction. Not all promissory notes are securities. The term "security" is meant to include, most generally, investment instruments marketed under a plan in which the seller of such instruments seeks the use of money of others on the promise of profits. Thus, where a promissory note is acquired by a merchant in the context of a sale of consumer goods or services, it is not a security. A promissory note is a security, however, where the factual circumstances surrounding its acquisition establish;
>
> (1) that purchase of the note involved a risk of loss to the investor;
>
> (2) that the note was acquired as an investment with the expectation of profit;
>
> (3) that there exists a common enterprise wherein the investor depends for his profit on the success of a party other than the borrower in performing his part of the venture; and
>
> (4) wherein the efforts of the third party (one other than the borrower or the investor) are the undeniably significant ones, such as essential managerial efforts which affect the failure or success of the enterprise.

This instruction correctly states the applicable law.

█ RCW 21.20.005(12) states in pertinent part that: "'Security' means any . . . investment contract . . ." The term "investment contract" is not defined in the statute, but has been the subject of judicial construction. In *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298–99, 90 L. Ed. 1244, 66 S. Ct. 1100, 163 A.L.R. 1043 (1946), the Court stated:

> an investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party . . .

In construing the meaning of "investment contract" under RCW 21.20, our Supreme Court has adopted the *Howey* test with one modification. Relying on *SEC v. Glenn W. Turner Enters.*, 474 F.2d 476 (9th Cir.), *cert. denied*, 414 U.S. 821, 38 L. Ed. 2d 53, 94 S. Ct. 117 (1973), the court in *McClellan v. Sundholm*, 89 Wn.2d 527, 574 P.2d 371 (1978) held that the requirement that the profits come "solely" from the efforts of others means the efforts of the others must be "'the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise.'" *McClellan*, at 532 (quoting *SEC v. Glenn W. Turner Enters., supra* at 482); *accord, State v. Markham*, 40 Wn. App. 75, 83, 697 P.2d 263, *review denied*, 104 Wn.2d 1003 (1985). In view of the holding in *McClellan*, we conclude that instruction 32A apprised the jury of the proper legal requirements for finding the investment to be a security.

Montgomery also contends that the instruments are not securities because they are exempt transactions under RCW 21.20.320. This argument is without merit. A transaction under RCW 21.20.320 may be exempt from compliance with RCW 21.20.040–.300 inclusive, but still be subject to the provisions of RCW 21.20.010. *Clausing v. DeHart*, 83 Wn.2d 70, 73 n.1, 515 P.2d 982 (1973).

## Sufficiency of the Evidence To Establish the Existence of a Security

■ Since instruction 32A is a correct statement of the law, the next question is whether there was sufficient evidence of the required elements of a security to sustain the jury's conclusion that the instruments were securities. The standard for reviewing the sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements beyond a reasonable doubt. *State v. Theroff,* 95 Wn.2d 385, 388, 622 P.2d 1240 (1980); *State v. Lindamood,* 39 Wn. App. 517, 521, 693 P.2d 753 (1985).

There was substantial evidence that the purchase of the note involved a risk of loss to the investor. These were high risk loans as evidenced by Philips' own testimony. The borrowers were people considered to be high credit risks who had difficulty obtaining conventional loans.

With regard to the requirement that the note be acquired as an investment with the expectation of profit, essentially two questions must be addressed. Dealing with the simplest first, it cannot be seriously disputed that the investors were looking for profit in the venture. Ample testimony indicates that they were lured by the promise of an annual yield of 30 percent on their investment.

The next question is whether the note was acquired as an investment. Some of the defendants urge that a determination of whether an "investment" was made depends on the weighing of several factors employed in the "risk capital" cases. *See, e.g., Amfac Mortgage Corp. v. Arizona Mall of Tempe, Inc.,* 583 F.2d 426 (9th Cir. 1978). In *Great Western Bank & Trust v. Kotz,* 532 F.2d 1252 (9th Cir. 1976), the court developed a list of factors to be employed in this analysis. They were: (1) the length of term—longer terms tending to favor finding an instrument a security; (2) collateralization—an unsecured instrument favoring a security characterization; (3) the form of the obligation; (4) the circumstances of issuance—whether to a single party or to a class of investors; (5) the relationship between the amount

borrowed and the size of the borrower's business—the larger the amount, the greater the risk; and (6) the contemplated use of funds—whether enterprise formation or ongoing business financing. The court added that other factors might be present in another case. *Great Western Bank*, at 1257–58.

In *Sauve v. K.C., Inc.*, 91 Wn.2d 698, 702, 591 P.2d 1207 (1979), our Supreme Court rejected the "risk capital" form of investment contract as being a security. In response, the Legislature broadened the definition of "security" to include "risk capital." RCW 21.20.005(12); *State v. Markham*, 40 Wn. App. 75, 83 n.6, 697 P.2d 263, *review denied*, 104 Wn.2d 1003 (1985); *Christgard, Inc. v. Christensen*, 29 Wn. App. 18, 22 n.1, 627 P.2d 136 (1981).

█ Adoption of the "risk capital" approach, however, does not obviate the *Howey* test that has heretofore been applied by the Washington courts. We note that *Wright v. Schock*, 571 F. Supp. 642 (N.D. Cal. 1983), *aff'd*, 742 F.2d 541 (9th Cir. 1984) is a factually similar case in which the court was faced with the same argument. One of the defendants argued that the question of whether the plaintiffs made an "investment" turned upon the weight of the factors employed in the "risk capital" cases. The court stated that the problem in the "risk capital" cases

> has been distinguishing an investment of "risk capital" from a "risky loan." The transactions involved have been negotiated loans or have involved a commercial lender or both. The Ninth Circuit has given the following summary of the risk capital test:
>
> > [T]he ultimate inquiry is whether [the plaintiff] contributed "risk capital" subject to the entrepreneurial or managerial efforts of others. This approach encompasses the economic realities standard and the *Howey* test which have been utilized by the Supreme Court in [*United Housing Found., Inc. v. Forman*, 421 U.S. 837, 44 L. Ed. 2d 621, 95 S. Ct. 2051 (1975)].
>
> *Amfac Mortgage Corp. v. Arizona Mall of Tempe, Inc.*, [*supra* at 432.] (citations omitted).

The risk capital test is thus an adaptation and elaboration of *Howey* which is particularly applicable to the

characterization of certain types of transactions. It can lead and most often has led to the conclusion that a given transaction is not an investment in securities but a commercial loan. "Risk capital" is not, however, a test that can short–circuit the *Howey* inquiry in the context of this case. For purposes of applying the *Howey–Forman* test, plaintiffs have made an "investment" in the ordinary usage of the term—they put up their savings on the promise of a return.

(Footnote omitted.) *Wright,* at 648.

The analysis of the *Wright* court is applicable to the case sub judice. The fact that investors put up money on the promise of a return is sufficient to establish an "investment."

The jury was also instructed that it must find a "common enterprise wherein the investor depends for his profit on the success of a party other than the borrower in performing his part of the venture". Evidence of this "common enterprise" was most vividly placed before the jury through the testimony of Montgomery.

Q Now, as you have been in this courtroom listening to the various witnesses that have testified and particularly those who testified as to when the borrowers quit paying, as you have listened to that testimony, does the event or the date the borrowers quit paying regularly have any relationship to any event that occurred with Sea–Tac?

A Yes.

Q What is that?

A When we were forced out of business the credibility that we had was all gone. We were, as I said, all over the press. We were not allowed to advertise.

And I don't believe that there is a borrower out there that didn't know of our situation. Many of them paid their loans; as a matter of fact, the majority of them did.

I never heard from any of those in this courtroom but Tatum. And I believe that it had a direct effect on those that did not pay.

It appears from this testimony that the lender's ability to obtain his profits was inextricably intertwined with the

success of Sea–Tac. When Sea–Tac's continued vitality came into question, the borrowers began to default on their payments.

Last, we must determine if there is evidence that the efforts of Sea–Tac were the undeniably significant ones that affected the success or failure of the enterprise. The defendants assert that Sea–Tac only brought lenders and borrowers together in a common loan transaction. The success of the lender's investment, they urge, was based upon the borrower's ability to repay and was not connected to any management or advisory skills of Sea–Tac. The evidence, however, does not support such a limited view of Sea–Tac's role in these investments.

In its own promotional literature, Sea–Tac stated that it investigated the borrower's ability to pay, furnished an appraisal, a totally insured title policy, and a written credit report from Credit Northwest. Sea–Tac also furnished a borrower's statement to the effect that the loan was for business purposes. For an additional fee, Sea–Tac also offered an account collection service and account guaranty.

The services offered by Sea–Tac could reasonably be considered the "undeniably significant ones" which affected the success or failure of the enterprise. If Sea–Tac did not complete an adequate investigation of the borrower's ability to repay, the lender would have little hope of receiving a return on his investment. An accurate appraisal and credit report was likewise crucial to the determination of the success of the investment. Most importantly, the furnishing of the business purpose statement was essential to the lender's ability to lawfully obtain an interest rate of 30 percent.

Based upon the foregoing and viewing the evidence presented in the light most favorable to the State, a rational trier of fact could find all the elements of a security beyond a reasonable doubt. *State v. Theroff, supra* at 388.

The remaining contentions and the court's answer to those contentions have no precedential value and pursuant to RCW 2.06.040 will not be published. *State v. Irwin,* 43

Wn. App. 553, 560, 718 P.2d 826 (1986). The judgments and sentences are affirmed.

SWANSON and WILLIAMS, JJ., concur.

Reconsideration denied October 14, 1986.

Review granted by Supreme Court January 9 and March 4, 1987.