IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 36524-7-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| VICTOR ALFONSO PANIAGUA, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, J. — Victor Paniagua appeals his convictions for second degree

murder, unlawful possession of a firearm, second degree assault, and witness tampering.

He challenges the trial court's refusal to declare a mistrial after a State's witness revealed

that Mr. Paniagua had been in jail at the time a DNA[1] sample was collected and

complains of prosecutorial misconduct in the form of improper witness examination and

statements made in closing argument. We find no error or abuse of discretion and affirm.

---

[1] Deoxyribonucleic acid.

FACTS AND PROCEDURAL BACKGROUND

On an early afternoon in June 2018, police officers responded to the report of a shooting at a residence in Pasco. When they arrived, they were waved into the home by Rosello Romero, the homeowner, who pointed to Abel Contreras, who was lying inside on a hallway floor, a large pool of blood near his head. The officers quickly concluded that Abel[2] was dead. The only other person on site was Betsabe Quinones, who was found hiding in a bedroom closet.

Abel rented a room from Mr. Romero, and after being shot inside his room, had collapsed outside its door. After interviewing Mr. Romero and Ms. Quinones, officers undertook to locate other individuals who had been at the home when the shooting had occurred, but who had fled. By the end of the day, they had taken Victor Paniagua into custody for questioning and applied for search warrants for the motel room where he was found and a home where Mr. Paniagua sometimes lived or at least kept belongings. By the day after the shooting, police had located two eyewitnesses who identified Mr. Paniagua as the shooter. Mr. Paniagua was charged with first degree murder, felon in possession of a firearm, and the first degree assault of one of the eyewitnesses, at whom he had allegedly pointed his handgun in a threatening manner before fleeing the scene.

---

[2] Since a key witness in the case was Ariel Contreras, we refer to both men by their first names, intending no disrespect.

When the case proceeded to a jury trial several months later, the charges had been amended. Mr. Paniagua was ultimately charged with first degree murder with a firearm enhancement, two counts of second degree unlawful possession of a firearm, first degree assault with a firearm enhancement, and two counts of witness tampering.

The State called over two dozen witnesses at trial, many of them police officers and forensic witnesses. Key among the State's lay witnesses were the two eyewitnesses to the shooting: Ariel Contreras and Efren Bueno-Gonzalez, the witness that Mr. Paniagua allegedly assaulted.

Mr. Bueno-Gonzalez testified that on the day of the shooting he had been hired by Mr. Romero and was laying plastic on the hallway floor outside Abel's room. Ariel, Mr. Paniagua and someone whose name he was unsure of were in Abel's room. At around 1:00 p.m. Abel came home and was upset on finding Mr. Paniagua in his room; he yelled at him to get out. Mr. Paniagua told Abel to calm down and said he was about to leave. According to Mr. Bueno-Gonzalez, Abel threatened to "take [Mr. Paniagua] out" if he did not leave, and started maligning Mr. Paniagua's mother. Report of Proceedings (RP) at 901. Mr. Paniagua got mad and said, "Well, take me out if you can." RP at 902. He then pulled a gun out of a small bag and put it "by the waistband covering the gun with the bag." RP at 903. Repeating, "get me out if you can," Mr. Paniagua put the gun to Abel's head. RP at 903. Abel said, "Just pull [the trigger] if you are a man. Pull it." RP

at 903. Mr. Paniagua pulled the trigger and shot Abel, who yelled "Ay," and tried to run but then stumbled out of the room. RP at 904.

Mr. Bueno-Gonzalez testified that as he tried to get up from where he had been working, Mr. Paniagua pointed the gun at him and said, "What about you?" RP at 905. Mr. Bueno-Gonzalez said he answered, "No. I have nothing against you." RP at 905. According to Mr. Bueno-Gonzalez, two women who had been in the living room—one of them, Mr. Paniagua's girlfriend—came running, demanding to know what Mr. Paniagua had done, enabling Mr. Bueno-Gonzalez to escape.

Ariel testified that he was homeless at the time of the shooting and had Abel's permission to stay in his room. He had stayed in the room the night before Abel was killed. He testified that Mr. Paniagua had come to Abel's room to look at some of Ariel's clothing that Ariel was hoping to sell. Abel arrived while Ariel was showing the clothing and wanted to know why Mr. Paniagua was there. Mr. Paniagua and Abel started arguing, the arguing got more heated, and Mr. Paniagua pulled out a gun. According to Ariel, Abel said to Mr. Paniagua, "[Y]ou might as well shoot me right now if you have the balls." RP at 993. Ariel testified that "with no hesitation Mr. Paniagua decide[d] to shoot him." RP at 993. After being shot, Abel backed out of the room and Mr. Paniagua followed him with the gun in the air. Ariel stayed in the room for a moment, not knowing what to do. When he emerged, he saw where Abel had fallen against the wall; it

4

looked like everyone else was gone. Ariel testified that he grabbed his belongings, ran

outside, dropped his belongings behind the garage, hopped the fence, and ran away.

Other lay witnesses included Dulce Moreno, who testified that she had been at Mr.

Romero's home at the time of the shooting with Lucero Porcayo, who was Mr.

Paniagua's girlfriend. Before the shooting, Ms. Moreno said she heard an argument

"between the guys." RP at 722. She testified she was outside when she heard a gunshot

and took off to a friend's house because she was nervous. She testified that "the floor

guy" had been working in a hallway between the living room and the bedroom; she

believed he would have been able to see into Abel's room. RP at 713.

Another witness, Mariam Martinez, a neighbor, testified that she was the one who

called 911 to report the shooting because Mr. Romero was so upset he could not unlock

his phone. Ms. Martinez testified she resides at 510 South 22nd Avenue, which is located

between Mr. Romero's house at 502 South 22nd Avenue and the home where Mr.

Paniagua lived, at 514 South 22nd Avenue. Witnesses disagreed about whether Mr.

Paniagua lived at 514 South 22nd; asked how she knew that was Mr. Paniagua's address,

Ms. Martinez answered, "Because he is my neighbor." RP at 450. She testified that

before phoning 911, she saw a number of people running past her yard toward Mr.

Paniagua's house, including Mr. Paniagua and a woman.

Juan Manuel Villa testified that at the time Abel was shot, he was living at 514

South 22nd Avenue, in a bedroom with a green wall that he shared with Mr. Paniagua's

5

sister, with whom he has a child. He described Mr. Paniagua as his "ex-brother-in-law." RP at 488. He testified that Mr. Paniagua was not living at 514 South 22nd at the time of the shooting but he had lived there in the past and kept belongings there.

Mr. Villa testified that on the day Abel was killed, Mr. Paniagua came to his room in a bit of a hurry and asked Mr. Villa for a ride. Asked why, Mr. Paniagua said only, "something bad happened." RP at 490. Mr. Paniagua asked Mr. Villa to meet him around the corner where he would get in the car. Mr. Paniagua got to the pick-up location by jumping a fence. Mr. Villa drove Mr. Paniagua to a motel called the Tahitian Inn. Mr. Paniagua was carrying a little strap backpack that Mr. Villa believed was black. Mr. Villa testified Mr. Paniagua told him, "If anyone asks you anything . . . [j]ust say you haven't seen me." RP at 497 (internal quotation marks omitted).

Officers obtained search warrants on the day of the shooting and undertook a search of 514 South 22nd Avenue and Mr. Villa's car, an orange Chevrolet Aveo. Mr. Villa identified 9-millimeter bullets that were found in the center console of his car and said they had been given to him by Mr. Paniagua. Ammunition and a holster had been found in Mr. Villa's room at 514 South 22nd and a .22-caliber rifle had been found about 12 feet away from the room. Mr. Villa testified that he had seen Mr. Paniagua with a rifle before, not a handgun, and that any firearm-related items that were found in the room when it was searched were not Mr. Villa's.

Security footage from the Tahitian Inn and other nearby businesses was played for the jury. The footage showed an orange car with two people in it drive from South 22nd Avenue to an alley behind the Tahitian Inn, where the car made a U-turn and stopped for a short time. One of the occupants of the vehicle got out and disappeared from view. Ms. Porcayo arrived at the Tahitian Inn on a bike and Mr. Paniagua arrived shortly after. The orange car then drove away. Ms. Porcayo and Mr. Paniagua both had black drawstring backpacks and both entered room 152. The videos of Mr. Paniagua and Ms. Porcayo traveling to the Tahitian Inn were recorded between about 12:45 and 1:19 p.m. on the day Abel was killed. The video showed two police officers knocking on the door of room 152 of the Tahitian Inn just before 5:00 p.m.

Testimony of the two police officers established that when they knocked on the door of room 152 on the afternoon Abel was killed, Yvette Zamarripa and Ms. Porcayo answered. Once the door was opened, the sound of a shower running could be heard and with weapons drawn, the officers ordered Mr. Paniagua to come out of the shower with his hands up. The officers took Mr. Paniagua into custody. They also transported Ms. Porcayo and Ms. Zamarripa to the police station for interviews.

Yvette Zamarripa testified that on the day Abel was killed and the police came to her room at the Tahitian Inn, she was living there with Lucero. Asked about what had happened that day, Ms. Zamarripa testified that Lucero and Mr. Paniagua had come to the room and Mr. Paniagua

7

stated he defended himself because the man that he had shot pulled out a machete. And he was getting close to him too much; that if he hadn't shot him then he was going to either die, or he was either going to die or, you know, defend himself.

RP at 916.

A search warrant executed at room 152 at the Tahitian Inn led to the discovery of a black drawstring backpack within other drawstring backpacks and, within the interior backpack, a Taurus 9-millimeter handgun and ammunition.

On the seventh day of Mr. Paniagua's trial, Mr. Paniagua moved for a mistrial. The day before, Detective Anthony Aceves had testified and had been asked by the prosecutor, "So you were tasked with getting some DNA swabs in regards to this case; is that right?" and "How did you go about doing that?" RP at 734. Part way through his answer, the detective provided an objectionable response, leading to the following sidebar and ruling:

> A: . . .[O]n the 6th of June I went to the Franklin County jail because we knew that's where the defendant was at.
>
> [DEFENSE COUNSEL]: Objection.
>
> [PROSECUTOR]: Let's back up.
>
> [DEFENSE COUNSEL]: Sidebar.
>
> (Whereupon a sidebar was conducted.)
>
> [DEFENSE COUNSEL]: Your Honor, Detective Aceves has been a police officer for many, many years. He knows darn well he is not supposed to indicate whether a defendant has or has not been in a jail cell incarcerated and that's highly prejudicial information.

8

He should have been advised that. If he wasn't we ask that the testimony he has provided so far be stricken so as to not further point out more the mistake that was made.

THE COURT: It's granted.

RP at 735. The trial court said it would give a curative instruction if requested and defense counsel told the court it would like a curative instruction given at the conclusion of the evidence.

Following the sidebar, the trial court told the jurors:

At this time the court is going to instruct the jury that the portion of this witness's testimony after having indicated that he acquired buccal swabs is to be stricken. It's been stricken from the record and you are to disregard in its entirety.

RP at 737.

In addition to moving for a mistrial on the basis of Detective Aceves's testimony, defense counsel argued that a mistrial was warranted in light of many leading questions that had been posed by the State throughout the trial, characterizing the State's objectionable leading as "more than I have ever seen in a trial before." RP at 875. Defense counsel stated that "some of it we were able to catch in time" but suggested that in other cases witnesses "received enough leading information that they testified in conjunction with what [the State] wanted." RP at 875.

The trial court denied the motion. With respect to leading questions, it observed that it had sustained defense objections to leading questions and struck the answers when asked to do so. It continued:

9

> The court is of the opinion that although the questions were leading . . . it does not believe it was eliciting responses that would have otherwise not been given, in any event, if the question had been asked without a leading nature to it. The court also does not find the defendant suffered any prejudice as a result of that.

RP at 878.

As for Detective Aceves, the trial court stated it had granted the objection and instructed the jury to disregard the testimony and "believes the jury has done that."

RP at 878. It added:

> Further, there was no testimony that Mr. Paniagua was actually being held in the jail at that time. There was no mention at that point of when this was even done. It could have been simply that he was over there for purposes of collecting it.

RP at 878-79. Its final observation was that there had been "plenty of testimony taken from the police department," to the point that he did not believe jurors would have been left with the impression that Mr. Paniagua was incarcerated at the time the buccal swab was taken. RP at 879.

A medical examiner testified that his autopsy of Abel resulted in a finding that the cause of death was a gunshot wound to the chest. The bullet had damaged Abel's right lung and perforated his aorta before exiting his body in the right side of the back, below the shoulder blade.

A forensic scientist from the Washington State Patrol (WSP) Crime Laboratory testified that an examination and test firing of the Taurus handgun found in the motel

room revealed "some agreement" between it and a bullet found at the crime scene. RP at 611. He characterized it as "greater than the level of agreement that is typically experienced just by pure chance between firearms of the same make and model," but he could not confirm the bullet recovered from the wall was shot from the Taurus handgun. RP at 611.

A forensic scientist from the DNA section of the WSP Crime Laboratory testified that she tested the Taurus handgun for DNA and determined that Mr. Paniagua and Ms. Porcayo contributed DNA to the gun. Ms. Zamarripa and Abel were excluded as contributors. Mr. Paniagua's DNA made up 82 percent of the mixture, Ms. Porcayo contributed 9 percent of the mixture, and two unidentified individuals contributed 6 and 3 percent. In cross-examination, the defense elicited the expert's testimony that for unknown reasons, some people, referred to as "super shedders" leave behind more DNA than other people. RP at 884. The expert testified that men tend to be super shedders more often than women. The expert was not questioned about whether there was any reason to believe that Mr. Paniagua was, or was not, a super shedder.

Ms. Porcayo had been identified as a State witness. Near the end of trial, the prosecutor informed the court that he had learned that if called as a witness, Ms. Porcayo intended to invoke her privilege against self-incrimination provided by the Fifth Amendment to the United States Constitution. The prosecutor had not yet decided whether to call her as a witness anyway. After calling all its other witnesses, the State

11

decided not to call her in light of her intention to invoke the Fifth Amendment. After the State rested, the defense rested without calling any witnesses. One of the witness tampering counts had charged Mr. Paniagua with attempting to induce Ms. Porcayo to testify falsely or withhold testimony, and since she did not testify the trial court granted a defense motion to dismiss that count.

In discussing jury instructions thereafter, the defense requested an instruction that "[t]he fact that the defendant was arrested and/or in jail cannot be used to infer guilt or prejudice him in any way." RP at 1021. The trial court gave the instruction over the State's objection.

During the instruction conference, the trial court asked if either party had concerns about the PowerPoint slides the other party had filed for presentation during their closing arguments. The State raised an objection to a defense slide that questioned why the State had not called Ms. Porcayo as a witness. It asked to be allowed to reopen its case if the defense would be allowed to question Ms. Porcayo's absence. The court refused the request to reopen, noting that both parties had rested, "so that ship has sailed." RP at 1077. The court said that questioning why the State had not called Ms. Porcayo was an appropriate defense argument, but "[c]ertainly the State could indicate, well, Defense had the opportunity if they wanted to call her as well." RP at 1078.

During the State's closing argument, the prosecutor reminded jurors of the evidence of DNA found on the Taurus handgun. Pointing out the three small contributors

(two unknown, and Ms. Porcayo) it continued with argument that drew a defense

objection:

> Where does that leave us?  Next was the defendant, Victor Paniagua, who contributed 82 percent of the DNA found on that firearm.  *He is no super shedder*—they—the scientists testified that also you get a lot of your DNA on an item when you touch it a lot.
>
> [DEFENSE COUNSEL]:  I am going to object, Your Honor.  He doesn't get to testify as to whether Mr. Paniagua is or is not a super shedder.  The only testimony from the expert was that men on average are more super shedders than females.
>
> [PROSECUTOR]:  Your Honor, no testimony came in that the defendant is a super shedder.
>
> [DEFENSE COUNSEL]:  You can't say he is not.
>
> THE COURT:  I will sustain the objection as to saying the defendant is not a super shedder.  I will allow, however, the presentation that there has been no evidence that he is.

RP at 1124-25 (emphasis added).  During her closing argument, defense counsel told

jurors that "[t]here is a huge variance when we have super shedders, but our technology is

not advanced enough to tell us how that affects or changes the DNA results."  RP at

1137.

> The defense also brought up the State's failure to call Ms. Porcayo, asking jurors,
>
> Lucero, Lucy Porcayo.  Why didn't the State call her to testify?  Yet another individual in the room.  The burden of proof is beyond a reasonable doubt.  Beyond a reasonable doubt comes from evidence and/or lack of evidence and there is a serious lack of evidence in this case.

RP at 1141.  Its related PowerPoint slide said:

13

Lucero "Lucy" Porcayo

➢ Why didn't the State call her to testify?

    ➢ The burden of proof is beyond a reasonable doubt. When taking the burden with the presumption of innocence it demands that any fact that has not been proven must be drawn in favor of Victor.

➢ She was in the room at the time of the shooting.

➢ She is seen on video riding her bike in the area after the shooting with a black backpack on.

➢ We don't know anything else except why did the State take her sandals from the Tahitian [Inn] into evidence and then not test them?

Clerk's Papers at 264.

In rebuttal argument, the State countered,

So why didn't the State call Lucero? Defense brought that up.
    Well, why didn't the Defense call Lucero? They could have used the subpoena powers of the court to bring her to testify but they didn't and they don't have to.

RP at 1149. The defense objected to this argument and the trial court called a sidebar.

The prosecutor said he believed he had complied with the trial court's ruling. The trial

court said, "I understand. I am going to sustain at this time. Move on. Dangerous

territory." RP at 1150.

The jury found Mr. Paniagua not guilty of first degree murder but guilty of the

lesser included crime of second degree murder, returning the special verdict that he was

armed with a firearm. It found him guilty of the second degree assault of Mr. Bueno-

Gonzalez, again returning a special verdict that he was armed with a firearm. It found

him guilty of the charge of unlawful possession of the Taurus handgun, but not guilty of

unlawful possession of the rifle found at 514 South 22nd Avenue. It found him guilty of

the surviving witness tampering count.

The trial court sentenced Mr. Paniagua to a period of total confinement of 453

months. He appeals.

## ANALYSIS

Mr. Paniagua contends that (1) prosecutorial misconduct, in the form of persistent

leading questions and questions eliciting hearsay, deprived him of a fair trial; (2) the trial

court abused its discretion when it denied the defense motion for a mistrial after

Detective Aceves improperly disclosed that Mr. Paniagua was in custody; and (3) the

prosecutor committed misconduct in closing argument by telling jurors that the defense

could have called Ms. Porcayo as a witness and stating that Mr. Paniagua was not a super

shedder. We address the contentions in the order presented.[3]

I.  MR. PANIAGUA DOES NOT DEMONSTRATE THAT THE PROSECUTOR'S
    OBJECTIONABLE QUESTIONING AMOUNTED TO PROSECUTORIAL MISCONDUCT

Prosecutorial misconduct is not attorney misconduct in the sense of violating rules

of professional conduct. *State v. Fisher*, 165 Wn.2d 727, 740 n.1, 202 P.3d 937 (2009).

It is, instead, a term of art that refers to "prosecutorial mistakes or actions [that] are not

---

[3] Mr. Paniagua also contends that cumulative error deprived him of a fair trial, a contention that we need not address since we find no error.

15

harmless and deny a defendant [a] fair trial." *Id.* To succeed on a prosecutorial misconduct claim, an appellant has the burden of establishing that the prosecutor's conduct was improper (as being at least mistaken) and was prejudicial. *State v. Stenson*, 132 Wn.2d 668, 718-19, 940 P.2d 1239 (1997). A defendant demonstrates prejudice by proving there is a "'substantial likelihood the . . . misconduct affected the jury's verdict.'" *In re Pers. Restraint of Pirtle*, 136 Wn.2d 467, 481-82, 965 P.2d 593 (1998) (quoting *State v. Pirtle*, 127 Wn.2d 628, 672, 904 P.2d 245 (1995)).

Mr. Paniagua argues that the prosecution engaged in an extraordinary amount of leading questioning during its direct examination. A leading question is one that suggests the desired answer. *Stevens v. Gordon*, 118 Wn. App. 43, 55, 74 P.3d 653 (2003). "Leading questions should not be used on the direct examination of a witness except as may be necessary to develop the witness' testimony." ER 611(c). Leading questions may be necessary to develop the witness' testimony and are permitted when a witness cannot recall preliminary or relatively unimportant facts. They are forbidden when counsel is trying to convey important substantive facts to the jury. *See* 5A KARL B. TEGLUND, WASHINGTON PRACTICE: EVIDENCE LAW AND PRACTICE § 612.10, at 577-78 (6th ed. 2016).

Mr. Paniagua points out that ultimately the trial court sustained 57 objections, including approximately 30 for leading questions, and only three answers were struck. He also points out that during a sidebar on the sixth day of trial, the trial court,

16

admonishing the prosecutor to refrain from asking leading questions, asked, "[D]o you understand what a leading question is?" Br. of Appellant at 11, 13 (citing RP at 682-83, 728). (The prosecutor answered that he did.)

The trial court was presented with this allegation of prosecutorial misconduct when Mr. Paniagua moved for a mistrial. Where, as here, the trial court had an opportunity to make its own ruling on a claim of prosecutorial misconduct, its ruling will be given deference on appeal. "'The trial court is in the best position to most effectively determine if prosecutorial misconduct prejudiced a defendant's right to a fair trial.'" *State v. Luvene*, 127 Wn.2d 690, 701, 903 P.2d 960 (1995) (quoting *State v. Lord*, 117 Wn.2d 829, 887, 822 P.2d 177 (1991)). In denying the mistrial motion, the trial court explained that it had sustained defense objections to the improper leading, struck the answers when asked to do so, and it did not believe the questioning elicited responses that would have been different had the question not been leading. It did not find that Mr. Paniagua suffered any prejudice.

Mr. Paniagua fails to demonstrate that the trial court's view does not deserve our deference. The principal prejudice argued by Mr. Paniagua is that witnesses heard the prosecutor's suggested answer and knew what information to provide when the question was rephrased. However, the prosecutor was often referring to answers already given by the testifying witness, the evidence was cumulative, the defense objected before the State could suggest an answer, the witnesses provided answers that elaborated far beyond the

17

minimal suggestion made by the State, or the witness explicitly rejected the State's suggested answer.

Mr. Paniagua also argues that the leading questions allowed the prosecutor to create a narrative instead of allowing it to be developed by a witness. However, counsel's frequent objections prevented that from happening.

Finally, Mr. Paniagua argues that the need to frequently object may have left the jury with the impression that he was trying to conceal information. That is a valid concern when an objection might strike jurors as hyper technical and actually does prevent a witness from providing information. But the concept of a leading question is not obscure and the trial court's rulings did not prevent any witness from providing information. The trial judge even explained what a leading question was in the presence of the jury, telling the prosecutor, "You cannot make suggestive questions. If your question suggests what the answer should be that is leading. If it's open ended, or if it even—calls for a yes or no without suggesting the answer then it is not leading." RP at 719. Given that the defense objections were repeatedly sustained, this case is very much like *State v. Markham*, 40 Wn. App. 75, 90, 697 P.2d 263 (1985), in which this court observed that when the trial court repeatedly sustains defense objections to leading questions, it will "if anything . . . make the prosecution, not the defense, look bad in the eyes of the jury."

18

Mr. Paniagua points to three instances in which State witnesses provided hearsay evidence that Mr. Paniagua was suspected of having shot Abel. Here again, defense objections were sustained.

In the first instance, the prosecutor's question did not elicit the hearsay; the witness volunteered it in a nonresponsive aside to his answer. In the second instance, the prosecutor posed a question to a police witness that invited a response that the witness had been told Mr. Paniagua was a suspect. In the third instance, the prosecutor posed a question to a different police witness that invited a response that the witness had been told to look for Mr. Paniagua at the Tahitian Inn.

The only prejudice from this hearsay that is identified by Mr. Paniagua is that the witnesses' answers "left the jury free to infer that the other witnesses told the police Paniagua was the shooter." Br. of Appellant at 28. The jury was properly presented with evidence that Mr. Paniagua was arrested and that search warrants were obtained for 514 South 22nd Avenue and the motel room where he was located. Jurors knew he was on trial. The jury was free to infer from properly-presented evidence that witnesses almost certainly told police that Mr. Paniagua was the shooter.

Because the prosecutor's actions were not prejudicial to the defense, prosecutorial misconduct is not shown.

19

II.     THE TRIAL COURT DID NOT ABUSE ITS DISCRETION WHEN IT REFUSED TO GRANT A
        MISTRIAL BASED ON THE DISCLOSURE THAT MR. PANIAGUA HAD BEEN IN CUSTODY

Mr. Paniagua argues the court erred when it denied his motion for a mistrial after

Detective Aceves testified that he "went to the Franklin County jail because we knew

that's where the defendant was at."  RP at 735.

"A trial court has wide discretion to cure trial irregularities resulting from

improper witness statements."  *State v. Gamble*, 168 Wn.2d 161, 177, 225 P.3d 973

(2010).  It should grant a mistrial "only when the defendant has been so prejudiced that

nothing short of a new trial can ensure that the defendant will be fairly tried."  *State v.*

*Emery*, 174 Wn.2d 741, 765, 278 P.3d 653 (2012).  "'In determining the effect of an

irregularity, [the court] examine[s] (1) its seriousness; (2) whether it involved cumulative

evidence; and (3) whether the trial court properly instructed the jury to disregard it.'"

*Gamble*, 168 Wn.2d at 177 (alterations in original) (quoting *State v. Hopson*, 113 Wn.2d

273, 284, 778 P.2d 1014 (1989)).  We review the denial of a motion for mistrial for an

abuse of discretion.  *Id.*

Mr. Paniagua asserts that "[a]llowing a witness or prosecutor to directly or

inferentially make reference to a defendant's incarcerated status during trial is an

improper comment on the defendant's guilt."  Br. of Appellant at 33.  The cases he cites

do not support that proposition, however.  The two cases on which he relies both

involved opinion testimony, not fact-based testimony, and the challenged statements had

nothing to do with the defendants' incarceration status. *See State v. Quaale*, 182 Wn.2d 191, 199-202, 340 P.3d 213 (2014) (officer's testimony defendant was "impaired" went to the elements of offense and was an impermissible opinion on guilt); *State v. Montgomery*, 163 Wn.2d 577, 594-95, 183 P.3d 267 (2008) (officers' testimony they "felt strongly" the defendant intended to manufacture drugs, the only disputed element, was improper opinion testimony).

The relevant case on which Mr. Paniagua relies, *State v. Mullin-Coston*, 115 Wn. App. 679, 693, 64 P.3d 40 (2003), addressed whether presenting evidence that a defendant was held in custody pending trial on his present charge is analogous to requiring him to appear in court in shackles, contravening the presumption of innocence. A jury seeing the accused in shackles can violate the presumption of innocence because it suggests the defendant is a "particularly dangerous or guilty person." *State v. Finch*, 137 Wn.2d 792, 844-45, 975 P.2d 967 (1999). The court in *Mullin-Coston* held that evidence that the defendant was in jail during certain conversations with State witnesses did not present the same constitutional problem because

> although references to custody can certainly carry some prejudice, they do not carry the same suggestive quality of a defendant shackled to his chair during trial. Jurors must be expected to know that a person awaiting trial will often do so in custody. Many factors go into the determination of whether a defendant will be released pending trial, including the seriousness of the charged crime and the person's ability to pay bail. In this case, a reasonable juror would know that a defendant in a first degree murder trial was not likely to be released pending trial unless he paid a substantial amount of bail, regardless of whether he was later found to be

21

> innocent. In contrast, shackling a defendant during trial sends the message
> to the jury that the judge, corrections officers, and security personnel
> present fear the defendant or think he might leap from his chair at any point
> and cause harm to someone in the courtroom. That is a much stronger
> prejudice than a reference to the fact that a defendant was in jail on the
> same charge for which he is being tried.

115 Wn. App. at 693-94.

In *Mullin-Coston*, the evidence that conversations with the defendant took place in jail was relevant, because their location provided necessary context and bore on credibility. *Id*. at 694-95. The court in *Mullin-Coston* acknowledged that admitting this type of evidence might be an abuse of discretion under ER 403 where there is little probative value. *Id*. at 694. Here, the fact that Mr. Paniagua was in jail at the time Detective Aceves went to collect a buccal swab has no probative value. But here, the evidence was not admitted; the court sustained Mr. Paniagua's objection, struck the testimony from the record, and instructed the jury to disregard it.

In moving for a mistrial, Mr. Paniagua argued that the steps taken by the court were not enough to ensure him a fair trial. As previously noted, the trial court is in the best position to determine whether prosecutorial misconduct prejudiced a defendant's right to a fair trial. *Luvene*, 127 Wn.2d at 701. The trial court rejected Mr. Paniagua's argument that Detective Aceves's testimony warranted declaring a mistrial because the court found the comment did not necessarily convey Mr. Paniagua was being *held* in jail, and "[i]t could have been simply that he was over there for purposes of collecting [the

swab]." RP at 879. The trial court heard the detective utter the challenged statement and can better assess than we can what jurors likely inferred. Mr. Paniagua does not explain why the court's assessment is unreasonable.

Even if the comment left the impression Mr. Paniagua was in custody, however, the court would not have abused its discretion by refusing to declare a mistrial. The irregularity was not irreparably prejudicial. The prosecutor's question did not invite the reference to Mr. Paniagua being in custody. Mr. Paniagua's being in custody was not mentioned again during the trial. Mr. Paniagua was on trial for first degree murder, and it would not have surprised the jury to learn he was held in jail. He argues the information was particularly prejudicial because he is the only individual that jurors heard was in custody after being interviewed, from which they might conclude he was the only one the police believed was guilty. The jury would have already understood that the State believed Mr. Paniagua was the guilty one: he was on trial.

Finally, the trial court granted Mr. Paniagua's request for an instruction to disregard the offending testimony. Juries are presumed to follow their instructions and only consider the evidence properly before them. *State v. Perez-Valdez*, 172 Wn.2d 808, 818-19, 265 P.3d 853 (2011).

The trial court did not abuse its discretion in refusing to declare a mistrial.

III.    THE STATE DID NOT COMMIT PROSECUTORIAL MISCONDUCT IN CLOSING
ARGUMENT

Finally, Mr. Paniagua contends the State twice committed prosecutorial misconduct during its initial and rebuttal closing argument.

In the State's initial closing argument, the prosecutor said of Mr. Paniagua, "He is no super shedder—they—the scientists testified that also you get a lot of your DNA on an item when you touch it a lot." RP at 1124. There are two ways the prosecutor's statement, "He is no super shedder," can be understood. One, and the interpretation urged by Mr. Paniagua, is that the prosecutor was asserting a *matter of fact*—a fact that was not supported by the evidence at trial. The other interpretation is that the reasonable *inference* to be drawn from the evidence that Mr. Paniagua contributed 82 percent of the DNA located on the Taurus handgun is that he was the most frequent handler of the gun, not that he was a super shedder.

It is improper for a prosecutor to make statements or submit facts to the jury during closing argument that are not supported by the evidence. *In re Pers. Restraint of Glasmann*, 175 Wn.2d 696, 705-06, 286 P.3d 673 (2012). However, "the prosecuting attorney has 'wide latitude in making arguments to the jury and prosecutors are allowed to draw reasonable inferences from the evidence.'" *Fisher*, 165 Wn.2d at 747 (quoting *State v. Gregory*, 158 Wn.2d 759, 860, 147 P.3d 1201 (2006)). Alleged improper comments are reviewed in the context of the argument as a whole. *Id.*

24

In context, the prosecutor was drawing an inference. This can be seen from the exchange that occurred in connection with the defense objection and the ruling on the objection. It was made perfectly clear (as the jurors probably already knew) that they had not been presented with evidence that Mr. Paniagua was, or was not, a super shedder.

In its rebuttal closing argument, the prosecutor responded to the defense query "[w]hy didn't the State call [Ms. Porcayo] to testify?" by questioning why Mr. Paniagua did not call her to testify. RP at 1141. Mr. Paniagua argues that a prosecutor "may not comment 'on the lack of defense evidence because the defendant has no duty to present evidence.'" Br. of Appellant at 21 (internal quotation marks omitted) (quoting *State v. Dixon*, 150 Wn. App, 46, 54, 207 P.3d 459 (2009)).

Nonetheless, remarks of the prosecutor that ordinarily would be improper are not grounds for reversal if they are provoked by defendant's counsel and are in reply to her or his statements. *State v. Davenport*, 100 Wn.2d 757, 760, 675 P.2d 1213 (1984); *accord State v. Swan*, 114 Wn.2d 613, 663, 790 P.2d 610 (1990). That was the State's justification for its rebuttal argument here.

Mr. Paniagua argues that the rebuttal argument was not invited or provoked, relying on *Dixon*. In that case, defense counsel argued there was reasonable doubt whether Corinne Dixon had dominion and control over a controlled substance found in her purse following her arrest for a traffic infraction because at the time she was stopped, she had a passenger whose name was not obtained by the arresting officer. Defense

counsel argued that the officer "'did not get enough information about this person to tell us what the reason was for his presence and what he was doing while Ms. Dixon was being arrested.'" *Dixon*, 150 Wn. App. at 56. In rebuttal, the prosecutor argued in relevant part, "Why didn't [Dixon] bring that passenger in to testify for her? . . . And if that passenger had anything at all to say, don't you think that [Dixon] would have contacted him?" *Id.* at 61 (Hunt, J. dissenting and concurring) (alterations in original).

*Dixon* was a split decision on the prosecutorial misconduct issue. The dissenting judge concluded that for the defense to "introduc[e an] alibi theory in closing argument . . . implicitly invited the State to reply." *Id.* (Hunt, J. dissenting and concurring). The majority held that the prosecutor's argument that Dixon should have produced the passenger as a witness "went beyond what was necessary to rebut Dixon's counsel's statements," however, for reasons that distinguish *Dixon* from this case. *Id*. at 57. In Dixon's closing argument, her counsel never questioned why the State failed to call the passenger as a witness; instead, defense counsel argued that reasonable doubt was present because of the arresting officer's inadequate investigation. The majority concluded that "[t]he prosecutor adequately rebutted Dixon's argument of reasonable doubt by pointing to the lack of evidence that the passenger placed anything in her purse." *Id*. Coupled with another improper suggestion by the prosecutor that Dixon herself should have testified, the majority found incurable prejudice. *Id.*

26

Here, by contrast, defense counsel explicitly questioned why the State failed to call Ms. Porcayo as a witness. The State's rebuttal was invited, and was temperate—the prosecutor even added that while the defense could also have called Ms. Porcayo, "they d[o]n't have to." RP at 1149. The trial court appears to have sustained the defense objection in an abundance of caution. It need not have sustained the objection. The prosecutor's rebuttal argument was a fair response to the defense argument.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Siddoway, J.

I CONCUR:

_____
Pennell, C.J.

_____
Korsmo, J.

27